

1994 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

7-8-1994

# United States of America v. A.D.

Precedential or Non-Precedential:

Docket 93-3197

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1994

Recommended Citation

"United States of America v. A.D." (1994). *1994 Decisions.* Paper 79.
http://digitalcommons.law.villanova.edu/thirdcircuit_1994/79

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1994 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT


NOS. 93-3197, 93-3205, 93-3209, 93-3225


UNITED STATES OF AMERICA

v.

A.D.

PG PUBLISHING COMPANY,
PUBLISHER OF THE PITTSBURGH POST GAZETTE*

                    Appellant in No. 93-3197

    (*Pursuant to Rule 12(a), F.R.A.P.)


UNITED STATES OF AMERICA

v.

T.Y.

PG PUBLISHING COMPANY,
PUBLISHER OF THE PITTSBURGH POST GAZETTE*

                    Appellant in No. 93-3205

    (*Pursuant to Rule 12(a), F.R.A.P.)


UNITED STATES OF AMERICA

v.

T.Y.

THE TRIBUNE-REVIEW PUBLISHING COMPANY*

                    Appellant in No. 93-3209

    (*Pursuant to Rule 12(a), F.R.A.P.)


1

UNITED STATES OF AMERICA

v.

A.D.

TRIBUNE–REVIEW PUBLISHING COMPANY*

Appellant in No. 93–3225

(*Pursuant to Rule 12(a), F.R.A.P.)

On Appeal From the United States District Court
For the Western District of Pennsylvania
(D.C. Crim. Action Nos. 93–00053–01, 93–00054–01)

Argued November 4, 1993

BEFORE:  SLOVITER, <u>Chief Judge</u>, and STAPLETON,
<u>Circuit Judge</u>, and RESTANI,** <u>Judge,
United States Court of International
Trade</u>

(Opinion Filed:  July 8, 1994)

W. Thomas McGough, Jr. (Argued)
Marketa Sims
Reed, Smith, Shaw & McClay
435 Sixth Avenue
Pittsburgh, PA  15219

Attorneys for Appellant
PG Publishing Company


Susan A. Yohe (Argued)
Ronald D. Barber
Strassburger, McKenna, Gutnick & Potter
322 Boulevard of the Allies
Pittsburgh, PA  15222

Attorneys for Appellant
Tribune-Review Publishing Company

Thomas W. Corbett, Jr.
United States Attorney
Paul J. Brysh (Argued)
Assistant United States Attorney
633 U.S. Post Office and Courthouse
Pittsburgh, PA  15219

Attorneys for Appellee

OPINION OF THE COURT

STAPLETON, Circuit Judge:

This appeal requires us to apply the confidentiality provisions of the Juvenile Delinquency Act, 18 U.S.C. §§ 5031-42 ("the Act").  We hold that the Act gives district judges authority to regulate access to the record of proceedings under the Act on a case-by-case basis through a balancing of interests.

I.

A.D. and T.Y., juveniles, were arrested in connection with gang-related armed robberies of Pittsburgh-area convenience, clothing, and food stores.  To initiate federal juvenile delinquency proceedings against A.D. and T.Y., the United States filed informations.  The government also sought to detain A.D. and T.Y., so detention hearings were scheduled before a magistrate.  PG Publishing Co., publisher of the Pittsburgh Post-Gazette, learned that the government would seek to close the detention hearings and appeared before the magistrate to object.

5

After hearing from the Post-Gazette, the government, and the juveniles, the magistrate closed the detention hearings on the ground that the Act mandates closure of all federal juvenile delinquency proceedings.

Following the detention hearings, the Post-Gazette filed motions to intervene in the two delinquency proceedings, as well as a motion to open the record of the detention hearings and to hold all further proceedings in open court. Tribune-Review Publishing Co., publisher of the Tribune-Review, filed similar motions.

In support of their motions, the newspapers argued that the Act does not mandate closed proceedings and records and that, in any event, the First Amendment requires the district court to make a discretionary determination on the need for confidentiality on a case-by-case basis. The government argued that the Act mandates closed proceedings and records and that the Constitution permits closure. A.D. and T.Y. also argued in favor of closure. The district judge granted the motions to intervene but denied the motions to open the proceedings and to unseal the records. The newspapers filed this timely appeal.[0]

_____

[0]Before this opinion was published, the proceedings against A.D. and T.Y. apparently concluded and the outcomes were reported in the press. See Mike Bucsko, 15 years for armed robber, 18, Pittsburgh Post-Gazette, Dec. 17, 1993, at B12. We nevertheless find that this case is not moot. The newspapers sought not only access to the court proceedings but also to the record of the proceedings, and such relief could still be granted.

In addition, we are of the opinion that the dispute between the newspapers and the government over access to juvenile proceedings is "capable of repetition, yet evading review." Southern Pac. Terminal Co. v. Interstate Commerce Comm'n, 219

6

II.

Under the Act, persons who violate the laws of the United States before reaching their eighteenth birthday may be subject to federal juvenile delinquency proceedings, provided that proceedings against them begin before their twenty-first birthday. §§ 5031-32. Provision is made for representation by counsel, § 5034, custody prior to disposition, §§ 5033 & 5035, and speedy trials, § 5036. After a juvenile is adjudged delinquent, a dispositional hearing is held, and the juvenile may be committed to official detention, placed on probation, or ordered to make restitution. § 5037(a). Observation and study of the juvenile can also be ordered. § 5037(d). Juveniles cannot be jailed with adults, and must be provided adequate facilities, care, and treatment. § 5039. Juveniles suspected of engaging in certain conduct may be subject to criminal prosecution as adults. § 5032.

The Act also contains several confidentiality provisions, which are at issue in this case. The first of these, § 5032, provides in relevant part:

---

U.S. 498, 515 (1911). "[I]n the absence of a class action, the 'capable of repetition, yet evading review' doctrine [is] limited to the situation where two elements combined: (1) the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there was a reasonable expectation that the same complaining party would be subjected to the same action again." Weinstein v. Bradford, 423 U.S. 147, 149 (1975). Both elements combined in this case -- the newspapers promptly sought access to the juvenile court proceedings, but were unable to complete litigation before the proceedings terminated, and other proceedings against other juveniles almost certainly will follow, to which the newspapers are again likely to seek access.

7

. . . any proceedings against [an alleged juvenile delinquent] shall be in an appropriate district court of the United States.  For such purposes, the court may be convened at any time and place within the district, in chambers or otherwise. . . .

The second disputed provision, § 5038, provides in relevant part:

(a) Throughout and upon completion of the juvenile delinquency proceedings, the records shall be safeguarded from disclosure to unauthorized persons.  The records shall be released to the extent necessary to meet the following circumstances:

(1) inquiries received from another court of law;

(2) inquiries from an agency preparing a presentence report for another court;

(3) inquiries from law enforcement agencies where the request for information is related to the investigation of a crime or a position within that agency;

(4) inquiries, in writing, from the director of a treatment agency or the director of a facility to which the juvenile has been committed by the court;

(5) inquiries from an agency considering the person for a position immediately and directly affecting the national security; and

(6) inquiries from any victim of such juvenile delinquency, or if the victim is deceased from the immediate family of such victim, related to the final disposition of such juvenile by the court in accordance with section 5037.

Unless otherwise authorized by this section, information about the juvenile record may not

8

be released when the request for information is related to an application for employment, license, bonding, or any civil right or privilege. Responses to such inquiries shall not be different from responses made about persons who have never been involved in a delinquency proceeding.

* * *

(c) During the course of any juvenile delinquency proceeding, all information and records relating to the proceeding, which are obtained or prepared in the discharge of an official duty by an employee of the court or an employee of any other government agency, shall not be disclosed directly or indirectly to anyone other than the judge, counsel for the juvenile and the Government, or others entitled under this section to receive juvenile records.

* * *

(e) Unless a juvenile who is taken into custody is prosecuted as an adult neither the name nor picture of any juvenile shall be made public in connection with a juvenile delinquency proceeding.

III.

The government argues that these confidentiality provisions mandate the closure of all juvenile proceedings and the sealing of all records. We decline the newspaper's invitation to decide whether this construction of the Act is consistent with the First Amendment. Nevertheless, we start with the proposition that the task of statutory interpretation we here face implicates First Amendment values and that the government's construction of the Act raises a substantial constitutional question.

9

The First Amendment provides a right of public access in both civil and criminal cases.[0] We have catalogued the interests protected by that right in the context of criminal proceedings:

> First, public access to criminal proceedings promotes informed discussion of governmental affairs by providing the public with a more complete understanding of the judicial system. This public access and the knowledge gained thereby serve an important educative interest. Second, public access to criminal proceedings gives the assurance that the proceedings were conducted fairly to all concerned and promotes the public perception of fairness. Public confidence in and respect for the judicial system can be achieved only by permitting full public view of the proceedings. Third, public access to criminal proceedings has a significant community therapeutic value because it provides an outlet for community concern, hostility, and emotion. Fourth, public

---

[0] See, e.g., Press-Enterprise Co. v. Superior Court, 478 U.S. 1, 3 (1986) ("Press-Enterprise II") ("First Amendment right of access to the transcript of a preliminary hearing growing out of a criminal prosecution"); Press-Enterprise Co. v. Superior Court of California, 464 U.S. 501, 508-10 (1984) ("Press-Enterprise I") (First Amendment values create presumption of openness for voir dire); Richmond Newspapers, Inc. v. Virginia, 448 U.S. 555, 580 (1980) (plurality opinion ) ("the right to attend criminal trials is implicit in the guarantees of the First Amendment"); United States v. Simone, 14 F.3d 833, 840 (3d Cir. 1994) ("the First Amendment right of access attaches to a post-trial hearing to investigate jury misconduct"); Republic of Philippines v. Westinghouse Elec. Corp., 949 F.2d 653, 659 (3d Cir. 1991) ("the First Amendment, independent of the common law, protects the public's right of access to the records of civil proceedings"); Publicker Indus., Inc. v. Cohen, 733 F.2d 1059, 1070 (3d Cir. 1984) ("the First Amendment embraces a right of access to civil trials"); United States v. Criden, 675 F.2d 550, 554 (3d Cir. 1982) ("Criden II") ("the public has a first amendment right of access to pretrial suppression, due process, and entrapment hearings").

> access to criminal proceedings serves as a check on corrupt practices by exposing the judicial process to public scrutiny, thus discouraging decisions based on secret bias or partiality. Fifth, public access to criminal proceedings enhances the performance of all involved. Finally, public access to criminal proceedings discourages perjury.

United States v. Criden, 675 F.2d 550, 556 (3d Cir. 1982) ("Criden II") (internal quotation marks omitted) (citing Richmond Newspapers, Inc. v. Virginia, 448 U.S. 555 (1980)).

This "First Amendment right of access is not absolute." United States v. Simone, 14 F.3d 833, 840 (3d Cir. 1994). Competing values may warrant a denial of access to proceedings and records in some instances. See Press-Enterprise Co. v. Superior Court, 478 U.S. 1, 9 (1986) ("Press-Enterprise II"). Where there has been such a denial, whether resulting from legislative or judicial action, courts confronted with a First Amendment challenge ask whether the closure is "essential to preserve higher values" and "narrowly tailored to serve that interest." Press-Enterprise Co. v. Superior Court, 464 U.S. 501, 510 (1984) ("Press-Enterprise I"). If an alternative would serve the interest well and intrude less on First Amendment values, a denial of public access cannot stand. See United States v. Raffoul, 826 F.2d 218, 224-25 (3d Cir. 1987). For this reason, the proponent of a legislatively imposed denial of access in a stipulated category of cases, where the trial judge is not free to weigh the competing interests on a case-by-case basis, has a difficult burden to carry.

11

Juvenile courts have been created in every state during the last century.  See In re Gault, 387 U.S. 1, 15-19 (1967). Recognizing the special sensitivity of information regarding juveniles and the impact that public dissemination of such information may have on the youths involved, states have devised a number of different approaches to accommodate these concerns. For the most part, these have not involved blanket prohibitions of access.  See Note, The Public Right of Access to Juvenile Delinquency Hearings, 81 Mich L. Rev. 1540, 1540 n.3 (1983).  It remains true, as the Supreme Court observed in 1967, that "[d]isclosure of court records is discretionary with the judge in most jurisdictions."  Gault, 387 U.S. at 24.

Neither the Supreme Court nor this court has had occasion to decide whether an across-the-board ban on access to juvenile proceedings would accord with the First Amendment.  The Supreme Court did address in Globe Newspaper Co. v. Superior Court, 457 U.S. 596 (1981), whether the First Amendment permits a statutory bar to public access to criminal trials during the testimony of minor victims of sex crimes.  The appellee urged that the statute served two compelling state interests:  "the protection of minor victims of sex crimes from further trauma and embarrassment; and the encouragement of victims to come forward and testify in a truthful and credible manner."  Id. at 607.  The Supreme Court acknowledged that both of these interests were compelling.  It held, however, that neither would justify an across-the-board ban on access in every instance involving a minor sex victim:

12

> [A]s compelling as that interest [in protecting minor victims of sex crimes] is, it does not justify a <u>mandatory</u> closure rule, for it is clear that the circumstances of the particular case may affect the significance of the interest. A trial court can determine on a case-by-case basis whether closure is necessary to protect the welfare of a minor victim. Among the factors to be weighed are the minor victim's age, psychological maturity and understanding, the nature of the crime, and desires of the victim, and the interests of parents and relatives. Section 16A, in contrast, requires closure even if the victim does not seek the exclusion of the press and general public, and would not suffer injury by their presence. . . . If the trial court [in the case before us] had been permitted to exercise its discretion, closure might well have been deemed unnecessary. In short, § 16A cannot be viewed as a narrowly tailored means of accommodating the State's asserted interest: That interest could be served just as well by requiring the trial court to determine on a case-by-case basis whether the State's legitimate concern for the well-being of the minor victim necessitates closure. Such an approach ensures that the constitutional right of the press and the public to gain access to criminal trials will not be restricted except where necessary to protect the State's interest.

<u>Id.</u> at 607-08. The Supreme Court added:

> We emphasize that our holding is a narrow one: that a rule of mandatory closure respecting the testimony of minor sex victims is constitutionally infirm. In individual cases, and under appropriate circumstances, the First Amendment does not necessarily stand as a bar to the exclusion from the courtroom of the press and general public during the testimony of minor sex-offense victims. But a mandatory rule, requiring no particularized determinations in individual cases, is unconstitutional.

<u>Id.</u> at 611, n.27.

13

Globe is not controlling in this case. It concerned criminal trials, which historically have been open to the press and general public. See Globe, 596 U.S. at 605 ("when our organic laws were adopted, criminal trials both here and in England had long been presumptively open") (quoting Richmond Newspapers, Inc. v. Virginia, 448 U.S. 555, 569 (1980) (plurality opinion)). No centuries-old tradition of openness exists for juvenile proceedings, which are a relatively recent creation, and proceedings to determine whether a juvenile is a delinquent are not generally regarded as criminal proceedings. See, e.g., United States v. Brian N., 900 F.2d 218, 220 (10th Cir. 1990) ("Under [the Juvenile Delinquency Act], prosecution results in an adjudication of status, not a criminal conviction."). Nevertheless, the detention and delinquency proceedings called for in the Act are closely analogous to criminal proceedings, and all the public interests in criminal proceedings that we catalogued in Criden II, 675 F.2d at 556, seem present and equally cogent here. Of equal importance, we cannot say that the countervailing interests that would be served by denying public access to proceedings under the Act are any more compelling than those that the Supreme Court acknowledged were being served by the challenged statute in Globe.

Thus, while Globe is not on all fours with the situation before us, it does suggest that an across-the-board ban on access to juvenile proceedings under the Act would pose a substantial constitutional issue. Accordingly, we will apply the well established rule of statutory construction articulated in

14

DeBartolo Corp. v. Florida Gulf Coast Trades Council, 485 U.S. 568, 575 (1988):

> [W]here an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress. Catholic Bishop, supra, at 499–501, 504. This cardinal principle has its roots in Chief Justice Marshall's opinion for the Court in Murray v. The Charming Betsy, 2 Cranch 64, 118 (1804), and has for so long been applied by this Court that it is beyond debate. . . . As was stated in Hooper v. California, 155 U.S. 648, 657 (1895), "[t]he elementary rule is that every reasonable construction must be resorted to, in order to save a statute from unconstitutionality." This approach not only reflects the prudential concern that constitutional issues not be needlessly confronted, but also recognizes that Congress, like this Court, is bound by and swears an oath to uphold the Constitution.

Accordingly, in the absence of an unambiguous directive to the contrary, we are reluctant to attribute to Congress an intention to deprive district courts of discretion to strike on a case-by-case basis the balance between the interests protected by the First Amendment and competing privacy interests. When we examine the Act with care, we fail to find such a directive.

IV.

We first focus on § 5032 and its provision that "court may be convened at any time and place within the district, in chambers or otherwise." This provision, in our view, evidences a congressional expectation that district judges will exercise their discretion when they decide where to hold hearings under

15

the Act.  Moreover, the addition of "in chambers or otherwise" suggests that this discretion is to include a decision regarding the availability and degree of public access -- we can think of no other persuasive reason for the inclusion of this clause. Thus, to our minds, § 5032 provides strong evidence that Congress did not intend an across-the-board ban on public access to proceedings under the Act.

When we turn to § 5038(a), we find additional evidence for this proposition and implicit recognition that the court retains discretion with respect to access to judicial records. We read this section as directed to protection of the <u>court's</u> records "of the juvenile delinquency proceeding," including the transcript.[0]  As a result, we understand the term "released" to refer to action the court authorizes.  Section 5038(a) does not mandate denial of access to the records of a proceeding -- it provides only that such records be "safeguarded against disclosure to <u>unauthorized</u> persons."  § 5038(a) (emphasis supplied).  The court is barred from authorizing access only in those situations involving "information about the juvenile record . . . when the request for information is related to an application for employment, license, bonding or any civil right or privilege."  Even in these few situations singled out in the

---

[0]The focus on protecting the court's record was clearer under the version of § 5038(a) which existed prior to its amendment in 1984 and provided that "the district court shall order the entire file and record of such proceeding sealed."  There is no suggestion in the text or legislative history of the 1984 amendment that the subject matter of this subsection was being changed.  <u>See</u> Sen. Rep. No. 225, 98th Cong., 2d Sess. 387-93, <u>reprinted in</u> 1984 U.S.C.C.A.N. 3182, 3527-33.

last paragraph of § 5038(a), the court is required to release the information sought if the request comes from one of the entities described in paragraphs (a)(1) through (a)(6).

Section 5038(a) lists in paragraphs (a)(1) through (a)(6) the entities that have a right to access the records of the judicial proceeding on request, and, as we have noted, it specifies in its concluding paragraph a limited number of situations where disclosure is forbidden. It does not, however, further define or limit the concepts of authorized and unauthorized persons. Most importantly, § 5038(a) implicitly recognizes that there are situations other than those described in paragraphs (a)(1) through (a)(6) and its concluding paragraph in which access could be authorized. If Congress intended paragraphs (a)(1) through (a)(6) to constitute an exclusive list of the situations in which access would be authorized, the concluding paragraph would be superfluous; if access was to be foreclosed in all but the situations described in paragraphs(a)(1) through (a)(6), the prohibition against disclosure in connection with applications for employment, licenses, bonding and civil rights would not have been necessary.

Section 5038(c), as we read it, has a different and more specific target than § 5038(a) -- information and documents "obtained or prepared" by an employee of the court or of another government agencies in the line of duty. The Act provides ample evidence of Congress' recognition that the district court would need information gathered by others in order to perform its responsibilities successfully. Section 5032, for example, lists

17

a number of factors that the court must consider in determining whether to transfer a juvenile for criminal prosecution as an adult: "the age and social background of the juvenile; the nature of the alleged offense; the extent and nature of the juvenile's prior delinquency record; the juvenile's present intellectual development and psychological maturity; the nature of past treatment efforts and the juvenile's response to such efforts; the availability of programs designed to treat the juvenile's behavioral problems." Section 5032 goes on to stipulate that "any proceedings against a juvenile . . . shall not be commenced until the prior juvenile records of such juvenile have been received by the court [or their unavailability explained]." Other provisions of the Act authorize the commitment of the juvenile "for observation and study by the appropriate agency," and require an examination of the juvenile's "personal traits, his capabilities, his background, any previous delinquency or criminal experience, and mental or physical defect, and any other relevant factors." § 5038(d).

We read § 5038(c) as directed to the protection of the fruits of the labors of the government employees who "obtain and prepare" this information. Some of this information will be contained in documents maintained in locations other than the Office of the Court Clerk, such as the files of the United States Attorney and the United States Probation Office. To this extent, § 5038(c) is broader than § 5038(a). We do not suggest that §5038(c) applies to bar the media from publishing anything they legally obtain. See Smith v. Daily Mail Publishing Co., 443 U.S.

18

97 (1979); Oklahoma Publishing Co. v. District Court, 430 U.S. 308 (1977). It does, however, bar anyone associated with a proceeding under the Act, including the United States Attorney and the employees of any other law enforcement agency, from disclosing such information to unauthorized persons. Because we read "others entitled under this section" to include persons authorized by the court to receive records under the authority implicitly recognized in § 5038(a), we believe § 5038(c) preserves the district court's discretion to weigh the juvenile's interest and the public's interest on a case-by-case basis.

Finally, we turn to § 5038(e). The government argues, with some persuasive force, that the prohibition against making public the picture of any juvenile is inconsistent with a congressional intent to have public hearings in cases brought under the Act. Those attending a public hearing necessarily would be exposed to the visual image of the juvenile involved unless elaborate and cumbersome precautions were taken.

A prohibition against making a juvenile's picture or name available to the public, however, strikes us as an indirect and unlikely way for Congress to stipulate that all hearings under the Act will be closed to the public. State statutes that restrict access to juvenile proceedings generally do so directly and clearly. Pennsylvania's delinquency law, for example, provides that "the general public shall be excluded," 42 P.S.

19

§6336(d),[0] and Delaware's provides that "[a]ll proceedings before the court and all records of such proceedings may be private," 10 Del. Code § 972(a).[0]

We think it far more likely that § 5038(e) was intended not to limit the discretion of trial judges to regulate access to juvenile delinquency proceedings, but to foreclose law enforcement officials from holding press conferences at which the name and picture of the juvenile would be "made public in connection with a juvenile delinquency proceeding."[0] Section 5038(e), then, like the rest of the Act, provides no evidence of a congressional mandate to close all juvenile delinquency hearings and seal all records.

---

[0] The official comment to the Pennsylvania statute adds that "[t]he statute as drawn permits the court in its discretion to admit news reporters."

[0] Delaware's statute allows the court to open proceedings "to the extent that the Court may consider publication in the public interest" and adds that "proceedings in a crime classified as a felony shall be open to the public." 10 Del. Code Ann. § 972(a).

[0] After A.D. and T.Y. were arrested, for example, authorities held a well-publicized press conference, see Michael A. Fuoco & Mike Bucsko, It's a federal case, gangs here warned: 7 charged in robberies facing U.S. law enforcement, Pittsburgh Post-Gazette, March 26, 1993, at A1, and a news release was issued by the U.S. Attorney, the FBI, the Allegheny County District Attorney, the Pittsburgh Police Chief, and the Pennsylvania Chief Deputy Attorney General.

20

V.

The government urges us to construe §§ 5032 and 5038 in light of the purpose and policy of the statutory scheme of which they are parts. The purpose of the Juvenile Delinquency Act, the government stresses, "is to rehabilitate, not to punish." In re Sealed Case, 893 F.2d 363 (D.C. Cir. 1990). To effectuate its rehabilitative purposes, the Act requires inquiry into the most sensitive aspects of a juvenile's life. Public access, the government maintains, would embarrass and humiliate juveniles, make it difficult to obtain evidence about delicate matters, and adversely affect the rehabilitation of juveniles by publicly labelling them as criminals. If §§ 5032 and 5038 were construed in accordance with this purpose and policy, the government asserts, public access to delinquency proceedings would be barred.

We, like the government, recognize the need to avoid embarrassing and humiliating juveniles, to obtain evidence about delicate matters, and not to affect the rehabilitation of juveniles adversely. We are not convinced, however, that Congress found across-the-board closure of juvenile proceedings necessary to achieve these goals. Rather, we think Congress left the delicate task of weighing the interests of the juvenile and the public to the informed discretion of the district judge in each case. District judges are experienced at striking this kind of delicate balance in the first instance in the context of

21

common law and other First Amendment access cases.[0]  We are confident that, here as there, they will be sensitive to the interests of juveniles and faithful to the objectives of the Act, as they determine the degree to which there will be public access to proceedings under the Act and the records generated in those proceedings.

## VI.

The Act does not mandate closed hearings and sealed records in all situations.  Accordingly, we will reverse the order of the district court denying the newspapers' motions to

---

[0] The Supreme Court has stated that the common law provides a right of access to judicial records.  See Nixon v. Warner Communications, Inc., 435 U.S. 589, 597-99 (1978).  There is also a "common-law rule of open civil . . . proceedings."  Gannett Co., Inc. v. DePasquale, 443 U.S. 368, 384 (1979).  We discussed the "common law right of access" in United States v. Criden, 648 F.2d 814, 823 (3d Cir. 1981) ("Criden I"), and in Publicker Indus., Inc. v. Cohen, 733 F.2d 1059, 1066 (3d Cir. 1984), we noted that "[t]he existence of a common law right of access to judicial proceedings and to inspect judicial records is beyond dispute."  See also Leucadia, Inc. v. Applied Extrusion Technologies, Inc., 998 F.2d 157, 161-165 (3d Cir. 1993); Republic of the Philippines v. Westinghouse Elec. Corp., 949 F.2d 653 (3d Cir. 1991); Littlejohn v. BIC Corp., 851 F.2d 673 (3d Cir. 1988); Bank of America Nat'l Trust & Savings Ass'n v. Hotel Rittenhouse Assocs., 800 F.2d 339 (3d Cir. 1986).

The Supreme Court has noted in common law access cases how difficult it is "to identify all the factors to be weighted in determining whether access is appropriate" and has suggested that "the decision as to access is one best left to the sound discretion of the trial court, a discretion to be exercised in light of the relevant facts and circumstances of the particular case."  Nixon, 435 U.S. at 599.  We have remarked on the need "to balance the strong public interest favoring access against legitimate privacy concerns" and observed  that "the trial court is generally given considerable leeway in the delicate balancing which must be performed."  Criden I, 648 F.2d at 829.

22

open the proceedings and to unseal the record.  We instruct the district court on remand to exercise its discretion concerning whether, and the extent to which, there should be public access to the records of these proceedings.[0]  Any denial or limitation of access must be supported by factual findings related to the circumstances of this particular case.

---

[0] As we have noted, the proceedings against A.D. and T.Y. apparently have concluded.  Accordingly, the district court need not exercise its discretion with respect to attendance at court hearings in those proceedings.  Separate consideration will have to be given in other cases to hearing access and to record file access.  There well may be situations in which a proper weighing of the public's interest and the interests of the juvenile will call for a denial of access to a hearing and nevertheless require access at a later point to the transcript of that hearing.