ROSENN, Circuit Judge,
concurring.
This case marks another effort by the press to test the outer limits of their right to gather and print news about all aspects of the judicial system and implicates the historic efforts of the courts to protect the confidentiality of a jury’s deliberative process. Our decision today recognizes the right of press access to the courts, including the right to interview jurors, but we reaffirm that this right is not absolute. The press’ right to interview jurors is separated by a delicate but important line between the permissible and the impermissible. We attempt to draw that line in this case.
I write separately, however, to express my deep concern that the court, by its opinion, may be announcing conflicting and confusing standards with respect to the findings a dis *1365 trict court must make before invoking closure during a criminal trial. Moreover, the court’s opinion unnecessarily requires post-trial factual findings before a trial court can attempt to guide the press and jurors over the dangerous shoals that must be carefully navigated whenever jurors are interviewed after a verdict.
A.
In this modem era, federal trial courts are confronted with increasingly complex eases in both civil and criminal trials. The trials are often complicated by intricate procedural rules, lengthy discovery, and time-consuming collateral issues. In a lengthy, nationally covered, high-profile criminal proceeding, such as this case, the trial judge’s attempts to control and protect the integrity of the judicial process are challenging and fraught with deep risks. An appellate court, therefore, should refrain from burdening the trial court with unnecessary and exacting findings regarding collateral matters.
The court commences its opinion with a standard that requires specific findings before a trial court may order closure so that a reviewing court can determine whether the trial court properly entered a closure order. The Supreme Court of the United States announced this standard in 1984 and this court followed it until today. Now, however, the court expands the standard by requiring the judge to make “detailed” (Maj.Op.. at 1351) and “individualized” (Maj.Op. at 1359) findings before effecting closure. More troubling is the requirement that the findings “clearly” establish that the closure was necessary to protect an overriding interest. (Maj.Op. at 1361-62).
I see no difference between the specificity of findings necessary to determine whether closure is justified and the findings required in any other dispositive aspect of a judicial proceeding. Trial court findings must be sufficient to enable a reviewing court to ascertain the basis and validity of the trial court’s questioned ruling. No greater purpose or burden attaches to findings because they are made in a proceeding involving First Amendment issues. This is demonstrated in Press-Enterprise Co. v. Superior Court of California, 464 U.S. 501, 104 S.Ct. 819, 78 L.Ed.2d 629 (1984), (Press-Enterprise I) where the Court discussed the quality of the findings necessary to overcome the presumption of openness and justify closure. The Court stated that the threatened interest must be articulated "with findings “specific enough that a reviewing court can determine whether the closure was properly ordered.” Id. at 510, 104 S.Ct. at 824. The Court reiterated that standard two years later in Press-Enterprise Co. v. Superior Court, 478 U.S. 1, 13, 106 S.Ct. 2735, 2742-43, 92 L.Ed.2d 1 (1986) (Press-Enterprise II). The Court required no more.
One year later, the press complained in United States v. Raffoul, 826 F.2d 218 (3d Cir.1987), that the district court did not articulate reasons for closure with sufficient specificity. Citing Press-Enterprise I, this court adhered to the standard of specific findings enunciated in that case. More recently in United States v. Simone, 14 F.3d 833, 840 (3d Cir.1994), this court determined that a party’s First Amendment right of access applied to post-trial examination of jurors for potential misconduct. We therefore considered the sufficiency of the district court’s findings to justify restriction of that right. Again, the court relied on the specific findings standard referred to in Press-Enterprise I. I see no reason in this case to depart from the standard we followed in Raffoul and Simone. Nothing here justifies a higher, more burdensome standard. Yet, the court’s opinion today enhances the specific findings standard. By requiring that the trial court’s findings “clearly” establish that closure was necessary to protect an overriding interest, the court puts us uncomfortably close to the clear and convincing standard of proof required to establish fraud. The additional findings now required can only lead to troublesome problems by requiring a trial court to calibrate its findings.
B.
With respect to the sensitive area of post-verdict interrogation of jurors, the trial court was justifiably concerned with the unsupervised behavior of a zealous and aggressive press in these “high-profile prosecutions for securities fraud, RICO conspiracy, mail fraud, and related charges.” The courts traditionally have worried about protecting the *1366 secrecy of a jury’s deliberations because of the substantial danger of embarrassing, harassing, or intimidating a juror. This case took approximately seven weeks to try and required more than six days of jury deliberations. Understandably, the trial judge was gravely concerned with preserving the integrity of the trial proceedings, the confidentiality of the jury’s deliberations and the thought processes of the individual jurors.
Under these circumstances, the trial court ultimately ordered the unsealing of the voir dire transcripts and the judge imposed certain limitations regarding the manner in which post-verdict interviews were to be conducted in order to protect the jurors’ privacy and in the interest of maintaining the secrecy of the jury deliberative process. The judge wrote each of the former jurors a letter informing them of his unsealing order and the consequent disclosure of the jurors’ names and hometowns. The court informed them that they might be contacted by the media and explained their role in the justice system and the tradition of secrecy accorded jury deliberations. The judge was obviously motivated by the long recognized view of the courts that “freedom of deliberative thought is central to the institution of trial by jury and that this freedom is endangered almost as seriously by the prospect of post-trial disclosure as it is by the .presence of spectators in the jury room.” Note, 96 Harv. L.Rev. 905 (1982-83).
The trial judge further advised the jurors that in issuing his order unsealing the public record, he had included the following guidelines to be followed by anyone seeking a juror interview:
(a) no juror is under any obligation to grant an interview nor may any juror be compelled to do so;
(b) repeated requests of a juror for an interview by any person or any associate of that person are strictly prohibited;
(c) once a juror expresses a desire to conclude an interview already in progress, the interviewer must immediately cease all questioning;
(d) although ... free to discuss any aspect of the case, [a juror] should be aware that no one may ask about the specific vote, statement, opinion, thoughts or comments of any juror other than [him/herself].
As the court notes today, the first limitation is consistent with “the routine instructions” customarily given to jurors in the federal system. As an “instruction” or guideline, no findings are required before it is given. The court also notes that the fourth limitation directed to maintaining the confidentiality of the jury deliberations is, like the first, consistent with the provisions of the federal Handbook for Trial Jurors. The Handbook instructs the jurors that “the court may enter an order in a specific case that during any [post-verdict] interview, jurors may not give any information with respect to the vote of any other juror.” Again, the Handbook does not require the district court to make any findings before it gives this instruction. In fact, the judge acknowledged the limited effect of this instruction when, during discussion of the contents of his proposed letter to the jurors, he informed counsel that “[i]f a juror freely chooses to disclose such information, so be it.” United States v. Antar, 839 F.Supp. 293, 305 (D.N.J.1993).
In its second and third instructions, the court may have been excessively cautious in its effort to protect the jurors from harassment, embarrassment, or intimidation. The problem with the second instruction is that more than one or two requests may be made of a juror, depending upon the nuance, tone, and language of the interviewer, without harassing the juror. This instruction also disregards the possibility that each juror may have a different tolerance for harassment. Therefore, the language of this instruction is arbitrary and inflexible.
The third instruction does not allow for a situation where a juror may express a desire which is tentative or indecisive. This instruction does not give an interviewer a reasonable amount of latitude. Had the court limited its instructions to forbidding the interviewers from harassing, embarrassing, or intimidating a juror, the instructions would have been consistent with the concerns expressed by the Supreme Court and reflected in Federal Rule of Evidence 606(b). However, the instructions actually given here unduly limited the perimeters of a reasonably permissible interview.
In United States v. Moten, 582 F.2d 654 (2d Cir.1978), the court of appeals considered *1367 an application for permission to conduct post-verdict juror interviews. The court observed that “the proper functioning of the jury system requires that the court protect jurors from being ‘harassed and beset by the defeated party in an effort to secure from them evidence ... to set aside the verdict.’ ” Id. at 664 (citing McDonald v. Pless, 238 U.S. 264, 267, 35 S.Ct. 783, 784, 59 L.Ed. 1300 (1915)). In addition, the court recognized that certain limits on post-trial inquiry into jury verdicts are necessary in the interest of finality. Id. There is also a danger, noted in Moten, that some jurors instead of feeling harassed, might revel in the attention of a post-trial interview, especially if interviewed by the national press or media, and disclose secrets or express misgivings, lingering doubts, or even complaints about fellow jurors. This might lead jurors to “imagin[e] sinister happenings which simply did not occur or [to] say[ ] things which ... would serve only to decrease public confidence in verdicts.” Id. at 665. The court, therefore, concluded that supervision of interviews is desirable, not only to protect jurors from harassment, but also to insure that the inquiry does not range beyond subjects permissible for juror testimony under Fed.R.Evid. 606(b).
The notes of the Advisory Committee with respect to Fed.R.Evid. 606(b) support the district court’s concern in this case.
The mental operations and emotional reactions of the jurors in arriving at a given result would, if allowed as a subject of inquiry, place every verdict at the mercy of jurors and invite tampering and harassment.
Under the federal decisions the central focus has been upon insulation of the manner in which the jury reached its verdict, and this protection extends to each of the components of deliberation, including arguments, statements, discussions, mental and emotional reactions, votes, and any other feature of the process.
Fed.Rules Evid.Rule 606(b).
I agree that the second and third instructions are an overstatement of the law which could unduly hamper a journalist in an appropriate interview. I reach this conclusion, not because there is an “absence of any finding by the court that harassing or intrusive interviews are occurring,” (Maj.Op. at 1364) but because the limitations imposed by the court had the effect of forbidding permissible inquiries that may not reach the point of harassment, embarrassment, or intimidation. In giving instructions on unsupervised interviews of jurors, findings are not only unnecessary and burdensome, but potentially impossible because the interviews will be conducted in the future. We must bear in mind that the confidentiality of the thought processes of jurors, their privileged exchange of views, and the freedom to be candid in their deliberations are the soul of the jury system. This interaction must be zealously guarded from any impermissible encroachment if the system is to survive. If there is any material error of law in a court’s instruction to the jurors, the injured party may obtain relief from the appellate court, as it did here.
Because I agree that the court erred in issuing instructions 2 and 3, I concur.